Rosen & Kantrow, PLLC
Proposed Counsel to IBK Partners Inc.
38 New Street
Huntington, New York 11743
631 423 8527
Avrum J. Rosen

UNITED STATES BANKRUPTCY COURT     RETURN DATE: **May 15, 2019**
EASTERN DISTRICT OF NEW YORK     TIME: **1:30 p.m.**

-----------------------------------------------------------X

In re:     Chapter 11

    Case No.: 19- 72940-reg

IBK PARTNERS INC.,

                             Debtor.

-----------------------------------------------------------X

**DEBTOR'S OPPOSITION TO THE MOTION OF 195 SAINT JAMES LENDER, LLC FOR RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. §362 (d)(1), (d)(2) and (d)(4) AND WAIVING THE FOURTEEN (14) DAY STAY IMPOSED BY F.R.B.P 4001(a)(3)**

TO:     HON. ROBERT E. GROSSMAN
          UNITED STATES BANKRUPTCY JUDGE

       IBK Partners Inc., the debtor and the debtor-in-possession (the "Debtor") in this chapter 11 bankruptcy case, by and through its proposed counsel, Rosen & Kantrow, PLLC,[1] hereby submits this as and for its Opposition to the Motion (the "Opposition") of 195 Saint James Lender, LLC ("Lender") for Relief from the Automatic Stay Pursuant to 11 U.S.C. §362 (d)(1), (d)(2) And (d)(4) and Waiving the Fourteen (14) Day Stay Imposed by F.R.B.P 4001(a)(3) (the "Motion"), and states as follows:

       1.      Debtor filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on March 21, 2019 (the "Petition Date"). The Debtor filed its petition, *pro se*. No trustee, examiner or official committee of general unsecured

---

[1] This firm was retained post-petition when a motion to dismiss the case for failure to retain counsel was brought on by the Court. The firm moved for expedited relief to be retained and for authority to accept a post-petition retainer. The firm also moved for *nunc pro tunc* relief to cure all deficiencies. The Court granted the latter request *ex parte* in the Order setting the hearing on the retention. At the hearing, the United States Trustee had no objection to the relief and the Court granted that motion. The United States Trustee uploaded that order. However, the case was transferred in the interim and that Order has not yet been entered.

creditors has been appointed in this case. The Debtor continues to remain in possession of its assets as a debtor-in-possession.

2. The Debtor is a New York Corporation, with its corporate office located at 195 St James Place, Apt 1, Brooklyn, New York. The Debtor is a single asset real estate entity as that term is defined in the Bankruptcy Code.

3. If this case had been filed by competent bankruptcy counsel, it would have been filed as a case related to *In re McWolle Development Corp.* ("McWolle") case No. 18-72623-reg or as a motion to reopen that case. As soon as the undersigned was retained by the client and prepared the Rule 1007 Affidavit pursuant to the Local Rules for the Bankruptcy Court, E.D.N.Y., the relationship to the McWolle case was immediately disclosed. Moreover, the facts pertinent to this case and the previous case, were set forth in the Rule 1007 Affidavit filed by this firm. Counsel made it clear, and the Debtor understood, the cornerstone of the relief sought by this Debtor, rests on full disclosure of everything that transpired in this case after the entry of this Court's dismissal Order entered in the McWolle case. Since the filing of the McWolle case, the Debtor's principal relocated from Freeport, New York, which Freeport location previously served as the Debtor's office address. The fact that the Debtor's principal previously maintained the corporate office in Freeport formed the basis of venue in Central Islip despite the fact that the properties which constitute the assets are located in Brooklyn to an apartment in the Saint James property described below. The Debtor and its principal took this action to make certain that it was in a position to obtain liability insurance as insuring a vacant building had become very expensive. Because the Debtor's principal no longer resided in Nassau County, the *pro se* Debtor's principal thought that the case had to be venued in Brooklyn.

4. The Debtor is the owner of two commercial properties; to wit, 195 Saint James

Place, Brooklyn, New York. ("Saint James Property") and 365 Macon Street Property, Brooklyn, New York, ("Macon Street Property") (together, referred to as the "Properties").

5. As noted above, the Properties were previously owned by McWolle. As this Court is aware, and as set forth herein, McWolle previously sought relief before this Court. From a review of the docket in the McWolle chapter 11 case, it would appear that the McWolle case was dismissed after the debtor filed its motion to dismiss subsequent to the Court issuing a decision lifting the automatic stay on the motion of the Lender. Because the dismissal was voluntary, the one hundred and eighty (180) day bar pursuant to section 109(g) of the Bankruptcy Code applied and McWolle was no longer eligible to be a debtor.

6. A reading of this Court's decision lifting the stay demonstrates that McWolle had less than competent counsel in its representation. To compound the problem, counsel moved for dismissal even though the United States Trustee had already moved for the same relief and the United States Trustee did not seek any such bar to refiling.

7. The Lender starts its Motion with the claim that this case is the "poster child" for a bad faith filing. The Debtor submits that this is anything but the case and further asserts that the Lender skims over crucial facts that demonstrate that it has not met its burden of proof on any of the relevant Bankruptcy Code sections upon which it relies. This case is not a typical case of "new debtor syndrome" because of unique and well documented events that occurred after the stay was lifted. McWolle and the Lender entered into several agreements for a pay-off of the mortgage secured by an interest in the Properties for a discounted amount by a date certain. It is the Debtor's position that the Lender breached those agreements, and there is serious doubt as to whether the Lender ever had any intent to honor the agreements. As a result, this case represents a situation where there is a legitimate dispute over the Debtor's rights under a contract and the

Debtor has sought bankruptcy relief to preserve its rights in its Properties while that dispute is litigated. The Debtor has prepared a detailed complaint for specific performance and related relief ("Complaint"). A copy of that Complaint is annexed hereto as Exhibit "A."

8. After the stay was lifted, but before the case was dismissed, McWolle and the Lender entered into settlement negotiations. Those negotiations resulted in the Stipulation and Reduced Payoff Agreement in Foreclosure Action ("Stipulation"), which is annexed hereto as Exhibit "B". The Stipulation had several elements. It provided McWolle with the right to satisfy the collateral mortgages secured by both Properties at the discounted amount of $4,300,000 by February 27, 2019. The Stipulation also provided significant benefits to the Lender. The Stipulation contained waivers of any defenses or counter-claims by McWolle and the guarantors. This was important in that the guarantor and McWolle had maintained that approximately $600,000 of the loan was never funded. This failure to fund as well as other bad faith actions alleged to have been taken by the Lender were also waived. McWolle further agreed that the foreclosure sale could take place on shortened notice, as the Lender would have needed a new order from the State Court as more than ninety (90) days had passed since the entry of the Judgment of Foreclosure and Sale. A copy of that Stipulation to Consent to Plaintiff's Motion to Schedule a Foreclosure Sale is annexed as Exhibit "C" (Foreclosure Stipulation").

9. In reliance on the Stipulation, McWolle had a closing scheduled on the Macon Property for early March and obtained a mortgage commitment for the refinance of the Saint James Property. That commitment is annexed hereto as Exhibit "D". Annexed hereto as Exhibit "E" are some of the most crucial documents in this case. Apparently, the Lender would not enter into the Stipulation without having proof of the Debtor's ability to obtain the required funds and insisted on seeing the mortgage commitments prior to entering into any arrangement. The

relevant e-mails are attached hereto. As a result, the Lender was fully aware of the fact that the Debtor was obtaining two separate loans from two separate new lenders with separate mortgages to be secured by each parcel. This information was provided prior to the extension of the closing date and was the reason why the closing date was extended. Lender's counsel is sophisticated real estate counsel who knew that there were going to have to be two separate closings and that the mortgages were going to have to be released on each parcel to effectuate the settlement. This issue is at the core of the dispute between the parties.

10. Apparently, the title company issuing the policies on the refinances had concerns about McWolle entering into the Stipulation and closing prior to the entry of an Order dismissing the McWolle chapter 11 case. Counsel for the title company corresponded with Debtor's counsel and advised him that everything was in place on both mortgages to allowing for the closing, but additional time was needed, apparently because the chapter 11 case had not been dismissed. That correspondence was forwarded to Lender's counsel. A copy of that correspondence is annexed hereto as Exhibit "F".

11. Based upon the letter, the commitments and communications, the parties then entered into the Stipulation Reaffirming and Modifying Stipulation and Reduced Payoff Agreement in Foreclosure Action (the "Amended Stipulation"). A copy of that document is annexed hereto as Exhibit "G". That Amended Stipulation extended the date to close on the refinances to March 15, 2019 and set the foreclosure sale for March 21, 2019, in the event the closings did not occur. This Amended Stipulation was entered into on February 27, 2019.

12. After the Amended Stipulation was signed, McWolle proceeded with setting up the closings so that the loans could close before March 15, 2019. The loans were ready to close and closings were scheduled for March 12, 2019. The closing on the Macon Street Property

5

actually took place and funded, but could not be released from escrow because the Lender never showed up. That closing was adjourned to the next day, when both closings (with two different lenders) were both set up for the same day.  Annexed hereto as Exhibit "H" is the affidavit of Ronald Fraser, the principal of McWolle and the affirmation of David Broderick, its counsel as to what transpired on the March 12, March 13 and March 15, when McWolle and its counsel appeared for two closings and the Lender refused to attend.  These affidavits are from the pleadings filed in the New York State Supreme Court.  They actually closed on the first transaction on the Macon Street Property to obtain the first $1,200,000, but could not fund because the Lender did not appear or provide a payoff.  All of the closing documents, including the escrow letter to hold off on closing for a few hours are annexed hereto as Exhibit "I".  The second closing was scheduled to start after the first one and close that same day.  It was cancelled when the Lender refused to appear.

14.     The issue raised by the Lender, almost a month after it was demonstrably aware that there were two loans, was that it refused to release its lien on one property until it was paid in full. The e-mails from the Lender's counsel are all over the map on this issue.  When counsel was advised of the time and place of the closings, counsel respond with "are these really closing". Counsel then failed to appear for those closings.  The closings were then rescheduled for March 13, 2019. Counsel then wanted to know if both Properties were both closing the same day and counsel asserted that counsel would not agree to closings that were not on the same day. When advised that the closings were scheduled as back to back closings, counsel pretended that they did not know where the closings were taking place (despite being given the address the previous day). When told that the closings were rescheduled from March 12 to March 13 by McWolle's litigation counsel (at a cost of $3,500 for a one-day extension of the commitment) the

6

Lender's counsel is advised to contact the closing attorney for the closing details. Two hours later, when counsel has actual knowledge that litigation counsel is in court, Lender's counsel sent an e-mail to him as to the name of the closing attorney, even though Lender's counsel had actually copied him on e-mails the day prior. The first loan actually closed while they were waiting for the Lender to show up. The Lender's present position appears to be that it did not know the loans were closing. A review of these e-mails, annexed hereto as Exhibit "E" and David Broderick's Affidavit (Exhibit "H") makes it evident that this was deliberate ignorance of facts that were well within the Lender's counsel's knowledge.

15.  The loan secured by an interest in the Saint James Property was also taking a second position on the Macon Street Property, so the Macon Street Property had to close before the other one could close to maintain lien priority. The Lender refused to attend the closing, provide a pay-off, or sign any releases. Had it attended, it would have been a simple matter to escrow the documents with the title company and close both transactions all on the same day with no risk to the Lender. This Court knows that is done every day in commercial loan closings. The Lender refused to do so, and at the last moment insisted on over a million dollars additional to the Loan proceeds (a total of $2,500,000) to issue the release on the Macon Street Property (Exhibit "E"). The manifest bad faith of this is demonstrated by the fact that the Lender now demanded a payoff of $2,500,000 when it asserted in its lift stay motion that the Macon Street Property was only worth $1,300,000. The Lender intentionally set an arbitrary new condition that it knew could not be performed.

16.  On March 15, 2019, given the repeated refusals of the Lender to attend the closing, McWolle filed the Order to Show Cause annexed as Exhibit "J" (without exhibits, which are voluminous). The court did not grant the stay and made the motion returnable on March 20,

2019. Opposition, annexed to the Motion was filed. As is set forth in the annexed affidavit of David Broderick, (Exhibit "K") he appeared on the return date to argue the motion. For some reason the motion had been marked off the calendar. Fearful that the Properties would be lost without ever getting a hearing on its claims, McWolle, on the advice of its counsel, transferred the Properties and the rights under the Settlement Agreement and the Amended Stipulation to the Debtor and this case was filed on March 21,2019, the day of the foreclosure sale. The Lender has repeatedly claimed that it is indicia of the Debtor's bad faith that it did not even bother to show up on the return date of the Order to Show Cause in the State Court. That is not accurate. McWolle did everything it could to obtain a hearing on the motion and only transferred the Properties when that opportunity was denied to it by an error in calendaring the motion.

17. The undersigned wants to make it clear to this Court that the Debtor is not trying to re-litigate the prior lift stay motion that was already decided by this Court. However, the situation as to the Properties has changed. This is no longer a speculative situation as to value in the abstract with competing appraisals. McWolle obtained financing net proceeds of $1,200,000 on the Macon Street Property with a sales price of $1,650.000 to a related entity. The Macon Street Property appraised out by that lender and the sale actually closed and was funded. The refinance of the Saint James Property was all set for that afternoon which would result in net proceeds of $3,100,000 towards the repayment of present mortgage. Thus, the entire $4,300,000 settlement was available, if Lender had only attended the closing and provided the required documents.

18. By way of background on these Properties, McWolle had made application for permission to construct two additional stories on the Saint James Property. The granting of these rights, which was expected in the prior case, has occurred. Copies of the plans are annexed

hereto as Exhibit "L"). This dramatically increased the value of that property. Lender was aware of this and, upon information and belief, this is not an institutional lender and invested in this mortgage as a "loan to own" transaction. The fact that McWolle was able to obtain the commitments for the financing and clear both loans to close is probative of the fact that there was significant equity in the Properties; equity which the Lender wanted for itself.

19. As set forth in the Complaint, it is the Debtor's position that the Lender breached the Stipulation when it refused to appear at the closings and provide the releases. This breach excused the Debtor from its agreements not to file further court proceedings, transfer the Properties or file further bankruptcy proceedings. Moreover, the Debtor is entitled to specific performance under that Stipulation and the Lender must be compelled to accept the $4,300,000 payoff.

## ARGUMENT

20. The Lender breached its obligation of good faith and fair dealing when it refused to show up or cooperate on the two closings on the Properties. In New York, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 639 N.Y.S.2d 977 (N.Y. 1995); *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F.App'x 13, 16 (2d Cir. 2014) (alteration in original) (quoting *Consol. Edison, Inc. v. Ne. Utils.*, 426 F.3d 524, 529 (2d Cir. 2005)). The covenant "prevents any party from doing anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. [It] is employed when necessary to effectuate the intentions of the parties, or to protect their reasonable expectations." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.,* 72 F.3d 84, 93 (2d Cir. 2013) (internal quotation marks omitted) (first quoting *Dalton*, 663 N.E.2d at 291; then quoting *M/A-COM Sec. Corp. v. Galesi,*

904 F.2d 134, 136 (2d Cir.1990)). Accordingly, to state a claim for breach of the covenant, a party must allege "facts tending to show that the . . . defendants sought to prevent performance of a contract or to withhold its benefits from the plaintiff[]." *Lee Dodge, Inc. v. Sovereign Bank, N.A.,* 148 A.D.3d 1007, 51 N.Y.S.3d 531, 533 (2d Dep't 2017).

21.     "In order to find a breach of the implied covenant, a party's action must 'directly violate an obligation that may be presumed to have been intended by the parties.'" *Gaia House Mezz,* 720 F.3d at 93 (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407-08 (2d Cir. 2006)); see also *Thyroff*, 460 F.3d at 407 ("However, this covenant only applies where an implied promise is so interwoven into the contract 'as to be necessary for effectuation of the purposes of the contract.'" (quoting *M/A-COM Sec. Corp. v. Galesi,* 904 F.2d at 136). A court must examine "not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007) (citation omitted). "Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the jury or other finder of fact." Id. (citation omitted).  "New York law prohibits either party from doing anything which will have the effect of destroying or injuring the rights of the other party to receive the rights of the contract," but "this implied covenant can only impose an obligation consistent with other mutually agreed upon terms in the contract." *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 360 (S.D.N.Y. 2017) (quotations and citation omitted).

22.     In addition, a claim for breach of the implied covenant can only lie where it "relates to the performance of obligations under an extant contract." *Ray Legal Consulting Grp.*

*v. DiJoseph,* 37 F. Supp. 3d 704, 727 (S.D.N.Y. 2014) (quoting *Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 941 (2d Cir. 1998)). Because a breach of the implied covenant is "merely a breach of the underlying contract," there can be no breach "without a governing valid contract." *Kapsis v. Am. Home Mortg. Servicing, Inc.*, 923 F. Supp. 2d 430, 452 (E.D.N.Y. 2013) (first quoting *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992); and then quoting *Garrett v. Music Publ'g Co. of Am., LLC,* 740 F. Supp. 2d 457, 463 (S.D.N.Y. 2010)).

23. In the present case, the documents exchanged between the parties prior to entering into the Amended Stipulation clearly indicated that the Lender would be paid from two separate closings with two different lenders on the Properties. The Lender was aware of this, at all times, and raised no issues regarding same until right before the scheduled closings. The Lender then insisted on simultaneous closings and then requested closings on the same day. McWolle set the closings for March 12, 2019, both to occur on the same day, as per the Lender's request. The Lender failed to appear. McWolle then paid an extension fee of $3,500 and set both closings for the next day, March 13, 2019. Again, the Lender failed to appear and the first closing actually closed in expectation that the Lender would appear. As the Complaint sets forth in great detail, these facts entitle the Debtor, as the assignee of McWolle to specific performance of the Amended Stipulation, along with consequential damages.

24. If the Debtor is successful in its action for specific performance, the Lender is only entitled to $4,300,000 (less any consequential damages awarded in that action). As a result, even under the appraisals attached to the Motion, there is significant equity in the Properties. The Debtor already has financing in place to pay that amount and will do so as soon as there is a resolution to the adversary proceeding it has commenced. The Debtor will file a Plan in the near

future proposing to pay all allowed claims in full on the Effective Date. As a result, there is equity in the Properties and the Properties are essential for a reorganization of the Debtor. As a result, Lender's Motion under section 362(d)(2) must be denied.

25.     The foregoing exposition of the facts in this case obviates most of the Lender's arguments that this is a bad faith filing. At the outset, Lender is seeking equitable relief and does not come to this Court with clean hands. Lender did everything it could to avoid its obligations under the Amended Stipulation. Had it appeared at the closing, all taxes on the Properties would have been paid in full. The HUD-1 from the Macon Street Property closing shows that all prior taxes and the current taxes were to be paid from proceeds (Exhibit "I"). The same was true of the St. James Property commitment, which required the payment of all taxes. As a result, the alleged lack of adequate protection arises from the Lender's own bad faith actions.

26.     The other "bad faith" factors also mitigate in denying stay relief. Yes, the Properties are not income producing, but the St. James Property was leased until the State Court appointed receiver drove all the tenants out by failing to provide services. The Debtor's principal has now moved back into the small apartment there so that the Properties could be insured. The principal will pay rent to the Debtor to pay current real estate taxes, and she already has paid for insurance on both properties. The reserves in the refinances include funds to begin the development of the Properties. The Debtor does have few unsecured creditors, but that alone is not a basis to lift the stay. Congress implicitly, if not explicitly, permitted single asset real estate cases and placed special restrictions upon them to make sure that debtors with legitimate bankruptcy objectives were afforded the opportunity to save their properties and proceed in chapter 11. Both refinances include reserves for future interest and taxes while the Properties are rehabilitated. The Debtor's affiliates include a construction company which will undertake to

make the repairs with "sweat equity". The timing of the filing has been addressed above and will be discussed further below.

27. As there is equity in the Properties and the Properties are needed for the successful reorganization, the motion under section 362(d)(1) and (d)(2) of the Bankruptcy Code must be denied. This brings us to the Motion pursuant to section 362(d)(4) of the Bankruptcy Code. That sub-section does not apply to this case because the filing was not part of a scheme to delay, hinder, or defraud creditors. Rather, it was filed due to the breach of a contract by the Lender who was attempting to obtain the Debtor's Properties for itself to capture the substantial equity, which it previously denied existed. Lender's Motion never discusses the elements of this sub-section and instead, applies what amounts to be a *per se* rule wherein a transfer in order to file a new bankruptcy case is all it need prove. But that is not the law. In *In re Sterling*, 543 B.R. 385, (Bankr. S.D.N.Y. 2015) Judge Lane analyzed the elements of this sub-section of the Code:

> This section was added by the Bankruptcy Abuse Prevention and Consumer Protection Act in 2005 and was "intended to reduce abusive filings.*" In re 177 Weston Rd., LLC*, 2011 Bankr. LEXIS 2848, at *4 (Bankr. D. Conn. July 22, 2011). The burden of proof is on the Movant to show "that the filing of the petition was part of a scheme to delay, hinder, or defraud it, which involved a transfer of the [p]roperty without its consent." Id.
>
> "'Scheme' is not defined by the Bankruptcy Code, but it is commonly defined to be: '(1) a systemic plan; a connected or orderly arrangement, esp. of related concepts . . . . (2) An artful plot or plan, usu. to deceive others.'" Id. (quoting Black's Law Dictionary 1462 (9th ed. 2009)). "In other words, a scheme warranting § 362(d)(4) relief implies a level of insidiousness or deceitfulness." 2011 Bankr. LEXIS 2848, [WL] at * 5; *see also In re Duncan & Forbes Dev., Inc.,* 368 B.R. 27, 32 (Bankr. C.D. Cal. 2006) ("A scheme is an intentional construct. It does not happen by misadventure or negligence."). Furthermore, "the use of the conjunctive in 'delay, hinder, and defraud' requires proof that the scheme served all three purposes." *In re Abdulla,* 2009 Bankr. LEXIS 642, at *4 (Bankr. D. Mass. Feb. 6, 2009).
>
> *Id.* at 394.

28. That court then looked at each element. In examining transfers made expressly

for the purpose of being able to file a bankruptcy petition the court held that:

> Furthermore, courts have held that fraud cannot simply be inferred from the fact that a transfer took place. Rather, the movant must provide the Court with "evidence that the debtor, by the transfer and bankruptcy filing, somehow defrauded or schemed to defraud [the movant]." See *In re Abdulla,* 2009 Bankr. LEXIS 642, at *3-5 (even where the debtors admitted the transfer was intended to bring the property into bankruptcy protection, court found that he movant had not shown debtors' intent was to hinder, delay and defraud the movant and that their actions constituted a scheme to those ends); *Wells Fargo Bank v. Dilworth*, 2014 U.S. Dist. LEXIS 146933, at *14-16 (E.D. Wis. Oct. 15, 2014) (stating that "standing alone, the fact that a debtor moved assets from debtor-owned LLCs to the individual debtor prior to the filing for relief [should] not constitute grounds to grant relief under Section 362(d)(4). . . . [T]hese sorts of transfers may be appropriate" and noting that debtor testified transfers were made on advice of counsel) (emphasis in original).

*Id*. at 395-396.

29.     A review of the few cases that have examined what satisfies the elements of this sub-section demonstrates that the necessary intent cannot be inferred when the filing was done to pursue a legitimate goal of a debtor in bankruptcy. *Reed v. N.Y. Cmty. Bank (In re Reed)*, 2016 Bankr. LEXIS 4240, (Repeatedly invoking the automatic stay, without any apparent intention of restructuring debts or obtaining a discharge, is not a legitimate alternative); *In re 177 Weston Rd., LLC*, 2011 Bankr. LEXIS 2848 (Bankr. D. Conn. 2011), (While the transfer of the Owners' interests in the Property was without the Bank's consent, that fact does not warrant the conclusion that the Debtor should be deprived of the opportunity of reorganizing and, *inter alia*, paying the entire amount of the Bank's allowed claim).

30.     In this case, the Debtor already has the means to pay off the reduced sum that the Lender agreed to take, and then Lender breached that agreement. The rights to the refinances and the rights under the Stipulation were assigned to the Debtor (Exhibit "M"). The Debtor has filed the adversary proceeding to enforce those rights and will file a Plan that calls for the closings to occur, free and clear of the Lender's liens with the liens to attach to the proceeds and to pay its

secured claim in full. It will be filed well before the time required for single asset real estate cases pursuant to section 362(d)(3) of the Bankruptcy Code.

31. In the case at bar the relief sought is exactly what is contemplated if *in rem* relief is actually granted and then there is a change in circumstances. Section 362(d)(4) of the Bankruptcy Code expressly states that when there is a bar order in place as to a debtor filing a chapter 11 petition "a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing". Thus, the Code provides a mechanism, even after *in rem* relief is granted, to revoke that relief for good cause shown. The Bankruptcy Code recognizes that there may be circumstances where there can be a legitimate filing with a "new debtor" and provides a debtor with the procedural mechanism to do exactly what the Debtor has done in this case. The principal of the Debtor in this case, along with her family and business associates have expended most of their resources attempting to salvage their investments in these Properties and to rehabilitate them and turn them into very profitable investments. For socioeconomic reasons, they had had to utilize hard money lenders that have not acted in good faith in their dealings with them.

32. The Debtor's principal will pay rent to the Debtor for the apartment she is occupying to fund the ongoing expenses of the Properties and to keep all post-petition taxes current and pay other operating expenses. As a result, the Lender is adequately protected and the present Motion should be denied in all respects based upon whatever requirements for adequate protection are determined by this Court.

WHEREFORE it is respectfully submitted that the Motion should be denied in its entirety, together with such other and further relief as to this Court seems just and proper.

Dated:     Huntington, New York
           May 8, 2019

ROSEN & KANTROW, PLLC
Proposed Attorneys for the Debtor-Plaintiff

BY: <u>S/Avrum J. Rosen</u>
     Avrum J. Rosen
     Deborah L. Dobbin
     38 New Street
     Huntington, New York 11743
     (631) 423-8527
     arosen@rkdlawfirm.com